UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-                                                                Case No.: 2:06-cr--FtM-29SPC

JAMES EARL SMITH
_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on the Defendant James Earl Smith's Motion to Suppress Evidence (Doc. # 21) filed on May 26, 2006. On July 6, 2006, a hearing was held before the Honorable Sheri Polster Chappell, United States Magistrate Judge. The Government was represented by Assistant United States Attorney David Haas, and the Defendant was represented by Russell Rosenthal, Esq. of the Federal Public Defenders Office. The Government called Cpl. Christopher Maler, Sgt. Jim Nichols, and Dep. Dwayne Tucker, all of the Charlotte County Sheriff's Office (CCSO) as witnesses and submitted the training certifications for the Canine Lilo and his handlers. (Gov. Ex's. 1-4). The Defendant submitted into evidence the Drug Enforcement Agency's (DEA) Report of the Investigation (Def. Ex. 3) and a photo of the area where the traffic stop took place (Def. Ex. 1). The Defendant did not testify on his own behalf.

**TESTIMONY AND EVIDENCE**

**Cpl. Christopher Maler**: (Tr. 4- 45).

Cpl. Maler has served with the CCSO for five (5) years. He currently serves as a road patrol training/supervisor. (Tr. 4:20-23). In the early morning hours of January 20, 2006, approximately

12:30-1:00a.m., Cpl. Maler was working selected traffic stops in the area around Scott and Cooper streets, an area he described as known for drug activity. (Tr. 5:16-25, 6:1-2).[1] Cpl. Maler testified that he observed three vehicles exit the driveway of a known drug house. (Tr. 7:1-9). Cpl. Maler began following the third vehicle leaving the residence. (Tr. 7:9-12). As he was following the vehicle, he ran the tag which came back to a rental vehicle. (Tr. 7:9-12). The Defendant was later identified as the driver of that vehicle. (Tr.8:4-7).

Cpl. Maler followed the Defendant for about a mile. (Tr. 16:16-18). At the intersection of Ann and Cooper streets, the Defendant went past the stop sign, stopping after the stop line, and then made a left turn and pulled into a driveway. (Tr. 7:19-24). Cpl. Maler initiated a traffic stop. (Tr.7:25, 8:1-3). Cpl. Maler made contact with the Defendant and asked for his driver's license and the rental agreement. (Tr. 8:5-7). The Defendant produced his Florida license and a valid rental agreement in the name of Gloria Blanding. (Tr. 26:18-25, 19:1-4). Cpl. Maler testified that he explained to the Defendant why he stopped him and that the Defendant acknowledged that he understood why Cpl. Maler pulled him over. (Tr. 21:18-22, 28:1-19). Cpl. Maler told the Defendant that he would give him a warning. (Tr. 8:4-12). He called for a K-9 unit to start heading his way. (Tr. 8: 17-19).

According to Cpl. Maler the passenger riding with the Defendant was extremely nervous. (Tr. 8:20-25). She was shaking and talking in a raspy voice. (Tr. 8:20-25). Her nervousness was so pronounced that Cpl. Maler thought she was ill and asked if she needed an ambulance. (Tr. 9:1-3).

Cpl. Maler then asked the Defendant if he knew who lived in the house adjacent to the

---

[1]Selected traffic stops merely indicates that the officers patrol an area looking for specific infractions such as speeding or running stop signs. (Tr. 15:19-25, 16:1-3).

driveway where he had parked his vehicle. (Tr. 9:7-12 ). Cpl. Maler noticed that the Defendant had a large amount of what appeared to be cash in his shirt pocket. (Tr. 9:12-13). When he asked the Defendant about it, the Defendant indicated that it was about $800.00 and that he was dropping it off with his grandmother. (Tr. 9:12-16). The Defendant said his family was in the bail bonds business. (Tr. 34:4-13). Cpl. Maler testified that the house remained dark throughout the duration of the traffic stop, that no one emerged from the residence to receive the cash. (Tr. 9:19-22).

Cpl. Maler asked the Defendant to step out of his vehicle. (Tr. 10:12). After seeing how nervous the passenger was, talking to the Defendant, the amount of cash in the Defendant's possession, and the dark house, Cpl. Maler asked the Defendant if he had anything in the car that he shouldn't have. (Tr.10:20-22). The Defendant said no. (Tr. 10:22). Cpl. Maler then asked for consent to search the vehicle. (Tr. 10:23-24). The Defendant told him that he could not search. (Tr. 10:24). At that point, Cpl. Maler called for the canine unit. (Tr. 10:24-25).

While Cpl. Maler was writing the warning, Dep. Dwayne Tucker arrived with his canine. (Tr. 11:17-25, 12:1-2). Cpl. Maler estimated that it only took Dep. Tucker two (2) to five (5) minutes to arrive on the scene after he had initiated the stop. (Tr. 11:9-12). While Dep. Tucker explained the dog sniff procedure, Cpl. Maler wrote the warning citation. (Tr.12:10-17).

**Sgt. Jim Nichols**: (Tr. 46-71).

Sgt. Nichols has served with the CCSO since 1990, and has been a sergeant for the last six (6) years. (Tr. 46:17-21). He currently serves as the supervisor and trainer for the CCSO's canine

unit. (Tr. 46:24-25). Sgt. Nichols stated that he has trained over 100 dogs, and that he is a level three (3) certified trainer. (Tr. 47:24-25, 48:1-19). [2]

Sgt. Nichols explained the qualities that the Sheriff's department looks for when selecting a canine to serve as a narcotics dog with the agency. The canine in this case, Lilo, was selected and began training in 2003. Lilo had 400 hours training as a patrol canine and another 160 hours training as a narcotics detection canine. (Tr. 51:16-25, 54:20-23). In addition, Lilo and his handler have in-service training two (2) times a month.(Tr. 57:3-5). Lilo has been trained to detect the odor of marijuana, cocaine, crack, heroin, and meth. (Tr. 59:19-22). Sgt. Nichols explained that the dogs are trained to detect the odor of the narcotic, not to identify the drug or to find a specific drug. (Tr.52:21-24). Canines alert to the presence of a narcotic odor either by passive behavior or by an aggressive action like scratching or biting the area where they smell the narcotic odor. (Tr. 59:10-18). He also stated a false positive alert can occur in cases where the narcotic may no longer be in the vehicle but may have been present at an earlier time. (Tr. 62:6-25, 63:1-6).

According to Sgt. Nichols, Lilo has been reliable in both training and actual field work situations. (Tr. 59:23-25, 60:1-1-2, 64:19-24). Sgt. Nichols testified that the CCSO is not required to keep accuracy ratings on it canines in the field. (Tr. 66:13-25, 67:1-10). He did, however, provide Canine Activity Reports from Lilo and Dep. Tucker from July of 2004 to the present. (Govt. Ex. 2).

**Dep. Dwayne Tucker**: (Tr. 72-105).

Dep. Tucker has served with the CCSO since 2002. (Tr. 73:5-8). Prior to his service with the CCSO, Dep. Tucker served with the Desoto County Sheriff's Office (DCSO). (Tr. 73:17-23).

---

[2]To be a level three trainer, one must have at least fifteen (15) years of training.

In 1997, while with the DCSO, he and his canine Jake received their training with the Florida Department of Law Enforcement's Canine School for 540 hours - 400 hours for road patrol and 140 hours in narcotics training. (Tr. 73:22-25, 74:1-5). He has been certified as Lilo's handler since the beginning of 2004. (Tr. 80:3-6).

Lilo is an aggressive alert dog. Dep. Tucker described Lilo's alert to the odor of a narcotic as a "dramatic change in his breathing, his rib cage blows, he has strong nasal breathing, and he snaps to the place where the odor emanates from." (Tr. 83:2-6). According to Dep. Tucker, Lilo has excellent reliability. (Tr. 84:20-25, 85:1-20).

On January 20, 2006 at approximately 12:30 a.m., Dep. Tucker was working road patrol in the Charlotte Harbor area of Punta Gorda, Florida. (Tr.86:22-25, 87:1-2). He testified that dispatch records reflect that Cpl. Maler was on the scene of a traffic stop at 12:51 a.m. and that he received a call at 12:51:30 a.m. to assist Cpl. Maler at a traffic stop. (Tr. 87:6-14, 94:5-17). He arrived at the scene at 12:56:33 a.m. (Tr. 95:3-11). Upon arrival, he spoke with Cpl. Maler. (Tr. 88:5-9).

Dep Tucker asked the Defendant for consent to search the vehicle. (Tr. 89:4-8). The Defendant said no. (Tr. 89:8). Dep. Tucker then explained the canine search procedure to the Defendant and returned to his patrol car to retrieve Lilo. (Tr. 89;8-11). Dep. Tucker asked the passenger to exit the vehicle and then had Lilo perform an exterior sniff search of the vehicle. (Tr. 89:18-25, 90:1-13). Lilo alerted to the driver's side door toward the door seem, the back of the driver's side door, and the rear corner of the trunk. (Tr. 91:4-21). After three hits on the vehicle, Dep. Tucker gave Lilo his reward and performed an interior search. (Tr. 92:4-12).

During the interior search, Dep. Tucker found a potato chip bag in the center console. (Tr.92:15-20). Inside the chip bag was a clear plastic bag containing what Dep. Tucker suspected

was cocaine and also a large cookie of rock cocaine. (Tr. 92: 18-22). Next to the potato chip bag was a blue clear bag with broken pieces of a cookie of rock cocaine. (Tr. 92:20-25) He also located unused clear zip lock bags. (Tr. 92:25-93:1).

## DISCUSSION

The Fourth Amendment protects individuals from unreasonable search and seizure. U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) *cert. denied,* 534 U.S. 830 (2001). However, temporary detention of a motorist during a traffic stop is constitutional if probable cause exists to believe a traffic violation has occurred. Whren v. U.S., 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L. Ed. 2d (1996). The Fourth Amendment test for a traffic stop should be whether a reasonable officer would have stopped the car for the purpose of enforcing the traffic violation. Id. Thus, in order to determine whether or not a specific Fourth Amendment requirement such as probable cause or reasonable suspicion has been met, the court must determine if the officer's action were reasonable. Ornelas v. U.S., 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L. Ed. 2d 911 (1996).

Courts have found that traffic stops that detain an individual between twenty to thirty minutes are reasonable. U.S. v. Hardy, 855 F.2d 735, 757 (11th Cir. 1988) (holding that twenty eight minutes is not an unreasonable detention for a traffic stop); U.S. v. Williams, 784 F. Supp. 1553, 1559 (M.D. Fla. 1991) *aff'd,* 978 F.2d 721 (table) (11th Cir. 1992) *cert. denied,* 507 U.S. 946 (1993) (holding that a twenty minute detention for a traffic stop was reasonable). "Nothing in the Constitution prohibits a police officer who permissibly has stopped an individual from requesting permission to conduct a search even if he has no basis for suspecting that the individual is carrying any contraband." U.S. v. Strickland, 902 F.2d 937, 941 n. 3 (11th Cir. 1990). Furthermore, it is well established that a sniff by a drug dog does not constitute a search within the meaning of the Fourth Amendment. U.S.

v. Holloman, 113 F.3d 192, 192 (11th Cir. 1997). Therefore, reasonable suspicion is not needed before a drug detection dog may make a sniff of the exterior of the vehicle. Hearn v. Board of Public Educ., 191 F.3d 1329, 1332 (11th Cir. 1999), *cert. denied,* 529 U.S. 1109 (2000). However, once the purposes of the initial traffic stop are completed, the officer cannot further detain a vehicle or its occupants unless something occurred during the traffic stop that created a reasonable suspicion to justify further detention. Holloman, 113 F.3d at 196 (citing U.S. v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995)).

The Defendant argues that the initial stop of the vehicle was unlawful, that the subsequent detention of the Defendant was unlawful because the scope of the investigation extended beyond the limits of the officers initial reasons for the traffic stop, and finally, the Defendant argues that there was no probable cause for the search of the vehicle because the CCSO did not provide evidence of Lilo's accuracy in alerting to the presence of narcotics. The Government contends the stop was lawful because the Defendant failed to stop at a stop sign, reasonable suspicion existed to investigate further, and Lilo's training was sufficient qualification to create probable cause for the search of the vehicle.

*(1) Whether the Initial Stop was Lawful*

"An automobile stop is [s]ubject to the constitutional imperative that it not be unreasonable under the circumstances." Whren v. U.S., 517 U.S. 806, 810, 116 S.Ct. 1769, 1772 (1996). "As a general rule the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. (citing Delaware v Prouse, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)). Thus, the Fourth Amendment test for a traffic stop is whether a reasonable officer would have stopped the car for the purpose of enforcing the traffic violation. Whren, 517 U.S. at 810. In order to determine whether or not a specific Fourth

Amendment requirement such as probable cause or reasonable suspicion has been met, the court must determine if the officer's actions were reasonable. Ornelas v. U.S., 517 U.S. 690, 696, 116 S.Ct. 1657, 1661-1662 (1996).

Here, Cpl. Maler witness the Defendant make an improper stop at a stop sign. (Tr. 7:19-24). Cpl. Maler testified the Defendant acknowledged that he understood why Cpl. Maler stopped him. (Tr. 21:18-22, 28:1-19). Under Florida law, the failure to stop at a clearly marked stop line at an intersection, rather than the stop sign itself, is sufficient probable cause for an officer to make a traffic stop. State v. Robinson, 756 So. 2d 249, 250 (Fla. 5th DCA 2000).

The Defendant argues that it was unreasonable for Cpl. Maler to stop him for the stop bar infraction and suggested that Cpl. Maler would not have stopped another driver for the same infraction. He argues that the stop was nothing more than a pretext to investigate potential drug activity. However, the subjective intent of the officer who made the stop, as to whether or not he would have stopped another vehicle for the same infraction, and whether or not he was on the look out for suspected drug activity is not relevant. Robinson, 756 So. 2d at 250. Cpl. Maler's action in stopping the Defendant for the stop bar infraction was reasonable under Florida law.

*(2) Whether the Scope of the Investigation Improperly Extended Beyond Limits of the Traffic Stop*

A traffic stop is a seizure within the limits of the Fourth Amendment. U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (citing Prouse, 440 U.S. at 653)). Because a routine traffic stop is only a limited form of seizure, it is more analogous to an investigative detention than to a custodial arrest. Purcell, 236 F.3d at 1277. Therefore, the Court's analysis of a traffic stop is similar to that found in Terry v Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Purcell, 236 F.3d at 1277. "Under Terry, an officer's actions during a traffic stop must be reasonably related in scope to the

circumstances which justified the interference in the first place." Id. (citing Terry, 392 U.S. at 20) (internal quotations omitted)). Furthermore, the duration of the traffic stop is limited to the time necessary to effectuate the purpose of the stop. U.S. v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999). The traffic stop may not last any longer than the time necessary to process the traffic violation unless there is "articulable suspicion of other illegal activity." Holloman, 113 F.3d at 196. The Defendant insinuates that Cpl. Maler delayed the writing of the citation beyond the time for Smith to leave to give Dep. Tucker and Lilo time to arrive on the scene. Thus, the Defendant argues that even though the formalities of the traffic stop were not complete, the pretextual extension of the traffic stop rendered the detention unlawful.

The Defendant relies on the United States v. Boyce, 351 F.3d 1102 (11th Cir. 2003), and United States v. Purcell, 348 F.3d 965, 971-972 (11th Cir. 2003), for the proposition that he was detained beyond the reasonable time frame for the traffic stop to occur. In Boyce, the Defendant was pulled over for a traffic violation. Id. at 1104. The officer became suspicious because he felt the Defendant was nervous, he was driving a rental car, his stated travel plans would put him two days late returning the rental car, and the Defendant's reasons for traveling were unusual. Id. The officer performed a records check on the Defendant's license and issued a "courtesy warning" for the traffic offense. Id. at 1105. The officer asked the Defendant if he could search his vehicle to which the Defendant responded no. Id. The officer then called for a narcotics dog and requested a criminal history records check. Id. The officer asked Boyce to wait until the canine unit arrived. Id. The dog arrived six (6) minutes later. Id. The dog alerted to the vehicle, and the officers searched the vehicle and found narcotics. Id. The Court held that no special circumstances existed for the officer to prolong the traffic stop. Id. at 1106. The Court found that the officer did not request a criminal

history check until after he had written the warning. Id. at 1107.  The Court further found that based upon the totality of circumstances, the officer did not have sufficient reasonable suspicion to detain Boyce. Id. at 1108.

Similarly in Perkins, the officer testified that after he had issued the citation he acted upon a "hunch" that Perkins was lying to him and initiated a new investigation based upon that hunch. 348 F.3d at 971.  There, the Court found that initiating a new investigation after the citation had been written and the purpose of the traffic stop had been completed was an unlawful detention. Id.

While it is true that an officer may not detain an individual as a ruse to obtain a canine officer to conduct a narcotics investigation, that is not the case here.  Cpl. Maler, unlike the officers in Boyce and Perkins, had not finished writing the warning citation before he called for a canine unit.  (Tr. 11:17-25, 12:1-17).  In fact, the undisputed testimony given at the hearing confirms that it only took a few minutes for the canine unit to arrive. (Tr. 11:9-12).  Cpl. Maler stopped the Defendant at 12:51a.m. and by 12:56a.m. Dep. Tucker and Lilo had arrived on the scene. (Tr. 87:6-14, 94:5-17, 95:3-11).  The warning was written after Tucker's arrival.  Therefore, the duration of the traffic stop did not exceed the time ordinarily needed to approach the vehicle, speak with the Defendant, run a records check, and  process a warning citation for a traffic violation.

The circumstances surrounding the Defendants actions raised a reasonable suspicion that would allow Cpl. Maler to inquire into areas that would exceed the initial circumstances that caused the initial stop.  The Defendant was seen leaving a known drug house in a neighborhood known for drug activity. (Tr. 7:1-9).  The Defendant stopped in the driveway of a residence where all the lights were off to allegedly drop off a large amount of cash for his grandmother at approximately 1:00a.m.  No one ever emerged from the house and no lights ever came on in the house to indicate that the

Defendant's grandmother occupied the house. (Tr. 9:19-22). The passenger in the vehicle was so nervous that she was having trouble speaking. Her nervousness was so extreme that Cpl. Maler thought she was ill and needed an ambulance. (Tr. 8:20-25, 9:1-3). Thus, Cpl. Maler observed suspicious behavior that reasonably led him to ask questions that extended beyond the scope of the initial traffic stop.

Even without the above listed circumstances, "the use of a well trained narcotics detection dog– one that does not expose noncontraband items that otherwise would remain hidden from public view– during a lawful traffic stop generally does not implicate legitimate privacy interest." Illinois v Caballes, 543 U.S. 405, 409, 125 S. Ct. 834, 160 L. Ed 2d 842 (2005) (citing U.S. v Place, 462 U.S. 696, 707, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983)). Dog sniffs are performed for the sole purpose of uncovering contraband that an individual does not have a lawful right to possess. Caballes, 543 U.S. at 409. Thus, a dog sniff conducted during a lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment. Id. at 410.

In the instant case, the dog sniff was performed on the Defendant's vehicle during a lawful traffic stop. Cpl. Maler had not yet finished writing the warning citation when Dep. Tucker arrived with Lilo and begin conducting the exterior search of the vehicle. (Tr. 11:17-25, 12:1-17). Lilo alerted to an unlawful substance. (Tr. 91:4-21). As a result, the Court must conclude that the Defendant's Fourth Amendment right to privacy was not violated either by the scope of Cpl. Maler's investigation or by the subsequent sniff search performed by Dep. Tucker and Lilo.

### *(3) Whether the Evidence should be Suppressed Because the CCSO did not Provide Documentation of Lilo's Accuracy*

The Defendant relies on United States v. Flores, for the proposition that a dog's accuracy and performance must be established before an alert warrants reliance by the Court. 871 F. Supp. 1411, 1420-1421 (D. N.M. 1994). The Defendant argues that Lilo was unreliable because the CCSO does not keep records of its canine's false alerts, and therefore Lilo's accuracy could be in doubt. As a result, the Defendant argues that there was no probable cause to search the Defendant's vehicle.

It is not disputed that the alert of a drug detection dog to a person's property can supply not only reasonable suspicion but probable cause to search property. Hearn v Board of Public Education, 191 F. 3d 1329, 1333 (11th Cir. 1999) *cert. denied.* 529 U.S. 1109 (2000). However, the Defendant argues that the Government cannot rely on Lilo's alert to establish probable cause to the vehicle's search because the Government failed to establish Lilo's reliability. Although the Eleventh Circuit has not extensively addressed the issue of a drug detection canine's reliability, the Court has found that training alone is sufficient proof of a dog's reliability. U.S. v Banks, 3 F.3d 399, 402 (11th Cir. 1993) (holding that probable cause arises when a drug-trained canine alerts to the presence of a narcotic); U.S. v. Sentovich, 677 F.2d 834, 837 n. 8 (11th Cir. 1982) (stating in dicta that the Eleventh Circuit follows the holdings of other circuits that training alone is sufficient proof of a canine's reliability)).

In the United States v. Diaz, the Sixth Circuit set forth guidelines as the quality and quantity of evidence necessary to establish the reliability of a drug detection canine as follows:

> [w]hen evidence is presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance

> properly goes to the credibility of the dog. Lack of additional evidence, such as documentation of the exact course of training, similarly would affect the dog's reliability. As with the admissibility of evidence generally, the admissibility of evidence regarding a dog's training and reliability is committed to the trial court's sound discretion.

25 F. 3d 392, 394 (6th Cir. 1994) (internal quotations omitted). In this case, the Government presented the training records of Lilo, Lilo's handler, Dep. Tucker, as well as the testimony of Sgt. Nichols, a level three (3) canine trainer. (Tr. 50, Govt. Ex. # 1, 61, Govt. Ex. 2, 79, Govt. Ex. # 3, 82, Govt. Ex. # 4). Lilo and Dep. Tucker were certified at the time of the sniff search and both had received extensive training prior to the date of the incident. Dep. Tucker and Sgt. Nichols testified that based on his field performance and training performance that Lilo was reliable. (Tr. 59:23-25, 60:1-1-2, 64:19-24, 91:4-21). The undisputed testimony of Dep. Tucker and Sgt. Nichols, Lilo's training records, and Lilo's and Dep. Tucker's certifications combine to show that Lilo was reliable on the date of the traffic stop in question.

The Defendant's conclusion that there was insufficient reliability on the part of this dog to constitute probable cause to search the Defendant's vehicle is without merit. Probable cause means that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). Lilo's training, certifications and actual field work, Dep. Tucker's training and certifications, Sgt. Nichols' expertise in training and certification is sufficient to establish the reliability necessary to find the required probability that contraband was in the vehicle. Thus, the Court respectfully recommends that the traffic stop, subsequent dog sniff, and search of the Defendant's vehicle did not violate the Defendant's Fourth Amendment rights.

Accordingly, it is now

**RECOMMENDED:**

The Defendant James Earl Smith's Motion to Suppress Evidence (Doc. # 21) is **DENIED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this ___17th___ day of July, 2006.



SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record